UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALETA GUTHREY, a conserved adult, through her Conservator, Areta Guthrey; and ARETA GUTHREY, an individual,<br><br>Plaintiffs,<br><br>v.<br><br>ALTA CALIFORNIA REGIONAL CENTER, a California non-profit corporation; ON MY OWN INDEPENDENT LIVING SERVICES, INC., a California corporation; MARY McGLADE, an individual; MICHELLE RAMIREZ, an individual; S.T.E.P. INC., a California corporation, Tammy Smith, an individual,<br><br>Defendants. | No. 2:18-cv-01087-MCE-JDP<br><br>**ORDER** |

Through the present lawsuit, Plaintiffs Aleta Guthrey ("Aleta"), a conserved adult, through her Conservator, Areta Guthrey ("Areta"), and Areta, as an individual (collectively "Plaintiffs" unless otherwise specified[1]) seek damages on grounds that Aleta was wrongfully denied access to support services to which she was entitled due to her multiple disabilities.  Areta, who in addition to serving as Aleta's conservator is also her

---

[1] Given their shared surnames, when referring to the Plaintiffs individually the Court will utilize their first names.

1

mother, further claims that both she and Aleta were discriminated and retaliated against when Areta asserted their right to such services. Defendants include three different entities[2] alleged to be responsible for the provision of services to Aleta, along with three individuals employed by those entities.

Presently before the Court are three different motions to dismiss brought on behalf of 1) Defendant Alta California Regional Center ("Alta") (ECF No. 49); 2) Defendant On My Own Independent Living Services, Inc. ("On My Own"), and On My Own's employees, Defendants Michelle Ramirez and Mary McGlade (ECF No. 48); and 3) Defendant S.T.E.P. ("STEP"),[3] together with STEP employee, Defendant Tammy Smith (ECF No. 54). All three motions are brought under the auspices of Federal Rule of Civil Procedure 12(b)(6)[4] on grounds that Plaintiffs' currently operative pleading, the First Amended Compliant ("FAC"), fails to state a claim upon which relief can be granted. The STEP Defendants also argue that Plaintiffs failed to exhaust their appropriate administrative remedies before initiating this lawsuit, and that the FAC goes beyond the permission previously accorded Plaintiffs to file an amended pleading. As set forth below, Defendants' Motions are GRANTED in part and DENIED in part.[5]

///
///
///
///
///
///

---

[2] Although an additional entity, On My Own Community Services, was initially also named as a Defendant, that organization was subsequently dismissed by Order filed September 30, 2021. ECF No. 67.

[3] This acronym is a shortened version of "Strategies to Empower People".

[4] All further references to "Rule" or "Rules" are to the Federal Rules of Civil Procedure unless otherwise noted.

[5] Having determined that oral argument would not be of material assistance, the Court ordered this matter submitted on the briefs in accordance with E.D. Local Rule 230(g).

# BACKGROUND[6]

Aleta is a 26-year-old woman diagnosed with developmental disabilities including microcephaly, a physical and intellectual impairment that substantially limits all of her major life activities. She cannot speak, write, or eat by mouth and must instead receive nutrition through use of a gastrostomy tube. Areta contends that her daughter qualifies as an individual with a disability under all applicable state and federal laws. Areta has served as Aleta's conservator since she turned 18, and until May 1, 2020, cared for Aleta on a full-time basis.

Given her disabilities, Aleta was referred at the time of her birth to California's regional care system. That system is governed by the Lanterman Developmental Disabilities Services Act, California Welfare and Institutions Code §§ 4501, et seq. ("Lanterman Act" or "Act"). The Act provides that services should be provided to prevent or minimize the institutionalization of developmentally disabled persons like Aleta so as to facilitate their care within the community. Provision of services under the Lanterman Act is progressively delegated first from the California Health and Human Services Agency to the California Department of Development Services ("DDS'), and then from DDS to regional care centers which, in turn, contract with the vendors who provide direct services to those qualifying for care.

Areta alleges that she is the single parent of three children with special needs, two of whom, including Aleta, are regional center customers. Because she suffers both from arthritis and bipolar disorder, Areta claims that caring for her family is difficult. In 2014, after moving to Citrus Heights, California, Aleta became a client of Alta, and Areta began discussing with Aleta's assigned service coordinator at Alta, the provision of Supported Living Services ("SLS") to Aleta in her own home. Although Alta had at times indicated that Aleta's feeding tube made independent living problematic, even with

---

[6] The factual averments contained in this section are drawn, at times verbatim, from the allegations contained in Plaintiffs' FAC.

3

personal attendant care, Areta was eventually introduced by Alta, in 2016, to On My Own and its representative, McGlade.[7]  Areta claims she signed numerous documents, including a "contract," so that On My Own could provide SLS to Aleta under Alta's auspices.  No further information about that contract is provided.

According to the FAC, McGlade told Areta the following year, in April of 2017, that she had located a roommate for Aleta.  Although Areta approved the apartment in question, another resident refused to vacate and a different apartment had to be found for Aleta and her proposed roommate.  Areta claims this process was complicated by Alta's desire to have a third young woman share the living arrangement.  Then, a meeting was scheduled between the other two prospective roommates from which both Areta and Aleta were allegedly "excluded."  Once Areta expressed disappointment about being left out of the meeting, she claims she was informed in writing, on May 1, 2017, that On My Own would no longer serve as Aleta's service provider.  Areta believes this was in retaliation for her advocacy on Aleta's behalf, and when she spoke to Aleta's service coordinator at Alta about what had transpired she claims to have been told that vendors like On My Own had an unfettered right to determine whether they wished to provide services.  According to Areta, On My Own also felt Aleta was "not ready to move into the community" and thus decided to end its services based on its own improper "determination" of Aleta's needs.  FAC, ¶ 57.

Several months later, in the summer of 2017, Aleta received another SLS referral through Alta, this time for Defendant STEP.  Areta again claims she "entered into a contract with STEP to provide SLS services to Aleta," without further explication.  Id. at ¶ 88.  When Aleta's case manager at STEP was hired away by Alta a few weeks later, Aleta's file had to be reassigned, moving Aleta farther down the line in housing

///

---

[7] In addition to McGlade, Plaintiffs also named On My Own's CEO, Michelle Ramirez, as an additional defendant although the FAC contains virtually no factual averments directed to Ms. Ramirez aside from alleging that as CEO, she was "legally responsible" for the actions of the company's employees and its alleged discriminatory policies.  FAC, ¶ 11.

4

placement given the new manager's existing caseload. This resulted in a delay in Aleta being considered for SLS until after Christmas 2017.

Areta contacted the CEO of STEP, Jacquie Dillard-Foss, to see if placement could be expedited on grounds that she and Aleta "were in crisis and the situation was not safe." Id. at ¶ 92. The FAC offers no further details as to what the "crisis" was, or how matters were unsafe.[8] When Areta requested a status in November 2017 as to when SLS would be provided, however, she was told by Alta's service coordinator that STEP was refusing to provide services. Areta states that the email STEP's SLS Service Manager, Tammy Smith, sent to Alta indicated that STEP's decision turning down the referral was based both on Areta's "advocacy" as well as Aleta's care needs. Id. at ¶ 98.

Areta further alleges that shortly before STEP rejected Aleta's placement Alta hosted a meeting for current SLS providers. While she offers no corroborating evidence, Areta states she believed that On My Own representatives attended that meeting and "intentionally influenced STEP's decision to reject Aleta." Id. at ¶ 99.

After STEP refused to provide services, Alta told Areta that the waiting list for SLS was several years. When Areta decided to herself attend a vendor orientation course at Alta in order to become an SLS vendor, however, another provider "suddenly appeared," and as of May 1, 2020, Aleta finally moved into her own home in the community with the assistance of two caregivers. Id. at ¶ 101.

Plaintiffs' initial Complaint was filed on May 1, 2018, after STEP's November 2017 refusal to provide Aleta's SLS and before Alta finally arranged for services to commence some two-and-a-half years later. That Complaint alleged six causes of action for:
1) discrimination under Title III of the Americans with Disabilities Act ("ADA");
2) retaliation under both the ADA, the Rehabilitation Act of 1973, and California's Unruh Civil Rights Act, as codified by California Civil Code § 51(f), 3) violations of 42 U.S.C.

---

[8] Elsewhere in the FAC there is a reference to Alta informing Areta, in response to Areta's request to take a "short vacation," that Aleta might have to be placed in an institution because of her feeding tube (id. at ¶ 33), but that allegation refers only to Alta and it remains unclear just what crisis Areta might have been referring to.

§ 1983 on grounds that Defendants' conduct violated the Equal Protection Clause of the United States Constitution: 4) negligent infliction of emotional distress; 5) negligent infliction of intentional distress; and 6) tortious breach of contract.

Because the initial Complaint did not specify which named Defendants were implicated in each of the causes of action presented, or enumerate the facts related to the particular Defendants upon which each claim rested, Defendants filed four separate motions requesting dismissal on grounds that no viable claim had been stated, or alternatively for a more definite statement under Rule 12(e).  By Order filed June 15, 2020, the Court granted Defendants' requests under Rule 12(e) and afforded Plaintiffs the opportunity to file an amended pleading.  ECF No. 46.  Dismissal under Rule 12(b)(6), however, was deemed premature given Plaintiffs' basic failure to specify which parties were implicated in each particular cause of action.

Plaintiffs' resulting FAC, filed July 5, 2020, at 48 pages is over four times the length of its predecessor.  ECF No. 47.  The FAC also increases the causes of action from the six originally pleaded to twenty-five.  Defendants' three separate motions to dismiss the FAC, as enumerated above, are now before the Court for adjudication.

## STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), all allegations of material fact must be accepted as true and construed in the light most favorable to the nonmoving party.  Cahill v. Liberty Mut. Ins. Co., 80 F.3d 336, 337-38 (9th Cir. 1996).  Rule 8(a)(2) "requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'"  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)).  A complaint attacked by a Rule 12(b)(6) motion to dismiss does not require detailed factual allegations.  However, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than

6

1  labels and conclusions, and a formulaic recitation of the elements of a cause of action
2  will not do." Id. (internal citations and quotations omitted).  A court is not required to
3  accept as true a "legal conclusion couched as a factual allegation." Ashcroft v. Iqbal,
4  556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 555).  "Factual allegations must
5  be enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at
6  555 (citing 5 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure
7  § 1216 (3d ed. 2004) (stating that the pleading must contain something more than "a
8  statement of facts that merely creates a suspicion [of] a legally cognizable right of
9  action")).
10         Furthermore, "Rule 8(a)(2) . . . requires a showing, rather than a blanket
11 assertion, of entitlement to relief." Twombly, 550 U.S. at 555 n.3 (internal citations and
12 quotations omitted).  Thus, "[w]ithout some factual allegation in the complaint, it is hard
13 to see how a claimant could satisfy the requirements of providing not only 'fair notice' of
14 the nature of the claim, but also 'grounds' on which the claim rests." Id. (citing Wright &
15 Miller, supra, at 94, 95).  A pleading must contain "only enough facts to state a claim to
16 relief that is plausible on its face." Id. at 570.  If the "plaintiffs . . . have not nudged their
17 claims across the line from conceivable to plausible, their complaint must be dismissed."
18 Id.  However, "[a] well-pleaded complaint may proceed even if it strikes a savvy judge
19 that actual proof of those facts is improbable, and 'that a recovery is very remote and
20 unlikely.'" Id. at 556 (quoting Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)).
21         A court granting a motion to dismiss a complaint must then decide whether to
22 grant leave to amend.  Leave to amend should be "freely given" where there is no
23 "undue delay, bad faith or dilatory motive on the part of the movant, . . . undue prejudice
24 to the opposing party by virtue of allowance of the amendment, [or] futility of the
25 amendment . . . ." Foman v. Davis, 371 U.S. 178, 182 (1962); Eminence Capital, LLC v.
26 Aspeon, Inc., 316 F.3d 1048, 1052 (9th Cir. 2003) (listing the Foman factors as those to
27 be considered when deciding whether to grant leave to amend).  Not all of these factors
28 merit equal weight.  Rather, "the consideration of prejudice to the opposing party . . .

1  carries the greatest weight." Id. (citing DCD Programs, Ltd. v. Leighton, 833 F.2d 183,
2  185 (9th Cir. 1987)). Dismissal without leave to amend is proper only if it is clear that
3  "the complaint could not be saved by any amendment." Intri-Plex Techs. v. Crest Group,
4  Inc., 499 F.3d 1048, 1056 (9th Cir. 2007) (citing In re Daou Sys., Inc., 411 F.3d 1006,
5  1013 (9th Cir. 2005); Ascon Props., Inc. v. Mobil Oil Co., 866 F.2d 1149, 1160 (9th Cir.
6  1989) ("Leave need not be granted where the amendment of the complaint . . .
7  constitutes an exercise in futility . . . .")).

## ANALYSIS

### A.   Exhaustion of Administrative Remedies

In its motion to dismiss, Defendant STEP initially argues that because Plaintiffs have failed to exhaust administrative remedies prior to filing this lawsuit all twenty-five causes of action, which are all grounded in the provision of services to the disabled, must fail. According to STEP, the Lanterman Act requires that regional centers like Alta "have an agency fair hearing procedure for resolving conflicts between" such centers and those applying for or receiving services under the Act. Cal. Welf. & Inst. Code § 4705(a). STEP also cites § 4710.5(a), providing that an applicant dissatisfied with a regional center's decisions believed to be illegal or discriminatory shall be afforded a fair hearing, and § 4712.5(a), which state that the hearing officer's resulting decision shall be final subject only to appeal through a petition for administrative mandate in state court. Finally, STEP points to case law finding that because the hearing procedure of § 4710.5 represents an "exclusive remedy," it must first be exhausted before seeking any judicial relief. Harbor Reg'l Ctr. v. Office of Admin. Hearings, 210 Cal. App. 4th 293, 312 (2012).

In opposition, Plaintiffs point out that the administrative actions contemplated by the Lanterman Act relate only to the "services" to be provided by the regional center, with "services" defined as the "type and amount of service components set forth in the

///

8

recipient's individual program plan…" Cal. Welf. & Inst. Code § 4703.7.[9]  Plaintiffs argue that because there is no dispute here about the level or type of services needed, the administrative remedy provisions of the Lanterman Act are inapplicable to this case. This is because, according to Plaintiffs, there is no dispute about the kind of services Aleta needed, only disagreement pertaining to delays in obtaining services and alleged retaliation against Plaintiffs due to Areta's advocacy on her daughter's behalf. Consequently, Plaintiffs maintain that the disagreement here is outside the purview of the Act's required administrative remedy.  They assert that STEP's case law, namely Harbor Regional, is inapplicable because the dispute there, unlike the present case, involved the nature and amount of in-home services the consumer should receive and thus fell within the purview of the Act's administrative hearing requirement.  Finally, and on and even more fundamental basis, Plaintiffs argue that because the language of § 4705(a) on its face is limited to disputes between regional centers and disabled "recipients of, or applicants for, service," the statute cannot be invoked by a vendor like STEP in the first instance.

      STEP makes no argument by way of reply in response to Plaintiffs' arguments above and the Court agrees that there is no administrative remedy requirement that attaches here.  STEP's request that the FAC be dismissed on that basis is therefore DENIED.

      **B.**    **Scope of FAC**

      As indicated above, Plaintiffs' initial Complaint consisted only of six causes of action rooted only in the federal ADA and Rehabilitation Act, under California's Unruh Act, and on a theory that Defendants were state actors triggering liability under 42 U.S.C. § 1983 for their violations of the equal protection rights guaranteed to Plaintiffs by the United States Constitution.  Because it could not be ascertained from the Complaint just what claims were directed against which particular Defendants, the Court

---

[9] An Individual Program Plan, or IPP, is required for disabled persons qualifying for services under the Act to identify the services that each particular individual and his family requires.  See id. at §§ 4640.7(b), 4647.

granted Defendants' request for a more definite statement in that regard under Rule 12(e) and gave Plaintiffs leave to amend accordingly.

The FAC subsequently filed is vastly different in scope than its predecessor. It contains three causes of action (Claims One through Three) for claimed violations of the Lanterman Act, where that Act was not even mentioned in Plaintiffs' initial pleading let alone made the basis of any claim for relief. Nor did the initial Complaint assert any cause of action for simple breach of contract despite the fact that the FAC contains three new claims against the various Defendants on that ground alone (Claims Ten through Twelve), as well as interference with contractual relations and inducing breach of contract causes of action against Alta, only (Claims Twenty and Twenty-One). In addition, Plaintiffs' claims in the FAC for unlawful business practices (Claim Nineteen), for violations of the California Constitution (Claim Twenty-Two), for § 1983 violations premised on due process rights guaranteed under the United States Constitution (Claim Twenty-Three), for conspiracy under 42 U.S.C. § 1985 (Claim Twenty-Four), and violations of California Government Code § 11135 (Claim Twenty-Five) have no relation to the claims asserted in the initial Complaint, for which the Court afforded amendment.

The permission accorded Plaintiffs to amend their initial Complaint to clarify the causes of action pleaded therein pursuant to Rule 12(e) does not confer unfettered, carte blanche permission to drastically change the complexion of the Complaint through the wholesale addition of multiple causes of action enumerated above. As STEP points out, it has long been held that an "amended pleading is one which clarifies. . . the same cause of action originally pleaded or attempted to be pleaded." Superior Mfg. Corp. v. Hessler Mfg. Co., 267 F.2d 302, 304 (10th Cir. 1959) (cert. denied 361 U.S. 876 (1959)). "It is the perfection of an original pleading rather than the establishment of a new cause of action." Id. A more recent decision, Taylor v. City of San Bernardino, 2010 WL 5641065 (C.D. Cal. Oct. 12, 2010) reiterates the same precept. Like the present case, the plaintiff in Taylor, after being afforded leave to amend her existing causes of action, proceeded to also assert six entirely new causes of action. Id. at * 6. The Taylor court

concluded that because the order permitting leave to amend "did **not** grant plaintiff leave to file additional claims….. [she] was required to obtain prior leave of court" to include such additional claims in her amended pleading, but had not done so.  Id.  The court accordingly dismissed the new claims, without prejudice, as having been filed in violation of Rule 15(a), which permitted amendment only with the opposing party's written consent or the court's leave.  Id.

Taylor's logic is equally applicable here.  Claims One through Three, Ten through Twelve, and Nineteen through Twenty-Five are accordingly dismissed, without prejudice to being renewed should Plaintiffs obtain the requisite leave of court to do so.

### C.   ADA Claims

Claims Four through Six of Plaintiffs' FAC all allege ADA claims under Title III against Alta, On My Own, and STEP, respectively, as well as against individual Defendants McGlade, Ramirez, and Smith.  Those claims correspond with Plaintiffs' First Cause of Action as set forth in their initial Complaint.

In enacting the ADA, Congress intended 'to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." Olmstead v. L.C. ex rel. Zimring, 527 U.S. 581, 589,  (1999) (quoting 42 U.S.C. § 12101(b)(1) ). Title III of the ADA advances that goal by providing that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation."  42 U.S.C. § 12182(a).

As California's Fourth District Court of Appeal noted in Martinez v. San Diego County Credit Union, 50 Cal. App. 5th 1048 (2020), in defining a place of "public accommodation" subject to protection under Title III, the ADA enumerates twelve categories of covered "places" and "establishments" that mainly reference physical locations.  Id. at 1060.  The implementing regulations provide no further detail and simply refer to a  "public accommodation" as a "facility," which is in turn defined as "all or any

portion of buildings, structures, sites, complexes, equipment, rolling stock ... or other real or personal property, including the site where the building, property, structure, or equipment is located." 28 C.F.R. § 36.104.

The Ninth Circuit is in accord. In Weyer v. Twentieth Century Fox Film Corp., 198 F.3d 1104 (9th Cir. 2000), the court noted that public accommodations as recognized by applicable legal authority are "actual, physical places where goods or services are open to the public, and place where the pubic gets those goods or services. Id. at 1114. There must accordingly be an actual physical place connected with the good or service in question for Title III liability to attach. Id.

In requesting dismissal of Plaintiffs' Title III claims, all three motions argue that the requisite connection with a physical place of public accommodation is lacking, since while both Alta, On My Own and STEP may have office headquarters, those physical locations have no direct relation to the disability support services provided, which are performed offsite. Neither of the three entities operates or owns any supported living facilities, nor have Plaintiffs alleged that they do. While a supported living facility would presumably, like a restaurant, theater, day care center or other place of public accommodation, have a physical location, there is no allegation that Defendants here provide their services from any such fixed location.

Plaintiffs try to surmount this obstacle by including bald allegations in the FAC that each entity Defendant "is a place of public accommodation because it occupies at least one office building in which it provides services to consumers and their families." FAC, ¶¶ 157, 171, 186. Without some factual showing of a real nexus between the actual services provided and those locations, however, this is no more than a legal conclusion insufficient under Twombly to meet Plaintiffs' burden in showing a potentially viable claim.

Plaintiffs nonetheless maintain that a more recent Ninth Circuit decision, Robles v. Domino's Pizza, LLC, 913 F.3d 898 (9th Cir. 2019), suggests that a less stringent approach to satisfying the physical location prerequisite should be employed. Plaintiffs

12

point to language in Robles to the effect that Title III "applies to the services **of** a place of public accommodation, not services **in** a place of public accommodation." Id. at 905 (emphasis in original).  While Plaintiffs maintain that this language helps them, the Court concludes it does not because the present matter is distinguishable from Robles.

Robles involved a Title III ADA claim against Domino's Pizza's website and app, which both allowed customers to order pizzas and other foods from brick-and-mortar Domino's locations either for at-home deliver or for in-store pickup.  913 F.3d at 902. The plaintiff, who was sight-impaired, claimed she could not order a customized pizza from a nearby Domino's because of the incompatibility of the app and website with screen-reader software.  Although the district court granted Domino's motion to dismiss, the Ninth Circuit reversed, concluding that the plaintiff had met her burden in establishing a sufficient nexus between Domino's website and app and its physical restaurants because the website and app allowed customers to order pizzas directly from the stores.  Id. at 905 ("Domino's website and app . . . are two of the primary (and heavily advertised) means of ordering Domino's products to be picked up at or delivered from the Domino's restaurants.").  Consequently, since the website and app "facilitated access to the goods and services of a place of public accommodation" under those circumstances, Robles found they fell within the purview of the ADA.  Id. at 905.  In other words, according to Robles, the ADA applied because the website there "connected customers to the goods and services of [the defendant's] physical" place.  Id. at 905-06.

Here there is no comparable nexus.  The disability services offered by Defendants did not, like Robles, have any connection with services provided in a physical location like a restaurant.  While Domino's website and app facilitated services unquestionably provided in their brick-and-mortar locations because they made food at those locations easier to obtain and pickup, there is no averment here that Defendants' offices had any comparable role in disability support services they arranged but did not physically provide.

///

A California Court of Appeal case decided shortly after Robles is also instructive. In Thurston v. Midvale Corp., 39 Cal. App. 5th 634 (2019) a blind woman sued a restaurant for disability discrimination under the Unruh Civil Rights Act for maintaining a website that was incompatible with her screen-reading software.  The Thurston court found the requisite nexus between the restaurant's website and the restaurant itself was satisfied by facts showing that the website provided consumers with the opportunity to review the menu and make a reservation, which the court found expedited the customer's ability to obtain the benefits of the restaurant's physical facility.  Id. at 638, 645-46.  As Thurston explained, these website features "speed[ ] up" the customer's "experience at the physical location" and thus facilitate the use and enjoyment of the services offered at the restaurant.  Id. at 645.  Thurston, in accord with Robles thus found that the ADA was implicated because these factors "connect[ed] customers to the services of the restaurant."  Id. at 646.  Again, no such nexus between Defendants' office buildings and their outside provision of disability support services has been alleged here.  Plaintiffs' Title III claims against Alta, On My Own and STEP accordingly fail as currently constituted, and are dismissed, with leave to amend.

Plaintiffs fare no better in arguing that Title III claims can be maintained against individual Defendants McGlade, Ramirez, and Smith.  Private individuals do not meet the definition of a business establishment operating a place of public accommodation. McFadden v. Washington Metro. Area Transit Auth., 949 F. Supp. 2d 214, 220 (D.D.C. 2013) (no individual liability under the ADA).  Plaintiffs have offered no authority suggesting otherwise.  The Fourth and Fifth Claims insofar as they relate to McGlade, Ramirez, and Smith are therefore dismissed and no further leave will be permitted.

### D. Unruh Act Claims

California's Unruh Act permits individuals injured by an ADA violation to recover damages through a private lawsuit.  Munson v. Del Taco, Inc., 46 Cal. 4th 661, 673 (2009).  Because Plaintiffs have not identified any viable ADA violation for the reasons

///

1  stated above, their Unruh Act claim also fails.  The Seventh through Ninth Claims are
2  therefore dismissed.

### E. Tortious Breach of Contract/Implied Covenant Claims

While Plaintiffs' original Complaint did ostensibly purport to include a cause of action for tortious breach of contract, the contracts at issue were not specified on grounds that they remained "in the hands of" the Defendants.  Complaint, ECF No. 1, 9:4-8.  The FAC, however, makes it clear that contracts allegedly breached flowed from violations of the Lanterman Act, as to which, as indicated above, the original Complaint was entirely silent.  To the extent Plaintiffs' Thirteenth through Fifteenth Claims for Relief, while entitled as causes of action for tortious breach of contract, are in fact yet another way of alleging a Lanterman Act claim, as already discussed Plaintiffs must seek leave of court to add that new claim and cannot do so simply because they were afforded leave to amend their original pleading.

Plaintiffs' state law tortious breach of contract/implied covenant claims fail, however, on an ever more fundamental basis.  Although an implied covenant of good faith and fair dealing may be implied by law into every contract, and while a breach of that covenant can potentially give rise to tort liability in a contractual setting, case law sharply limits the kinds of contracts that can support an additional claim sounding in tort.  Generally, "[c]onduct amounting to a breach of contract becomes tortious only when it also violates an independent duty arising from principles of tort law." Freeman & Mills, Inc. v. Belcher Oil Co., 11 Cal. 4th 85, 94-95 (1995) (citing Applied Equipment Corp. v. Litton Saudi Arabia Ltd., 7 Cal. 4th 503, 515 (1994).  The California Supreme Court concluded that tort recovery is precluded other than in the context of insurance coverage, at least in the absence of violation of an independent duty arising from principles of tort law other than denial of the existence of, or liability under, the breached contract.  Freeman & Mills, 11 Cal. 4th at 102.

This is not a case involving insurance coverage or an insurance claim.  Nor does this case appear to fall within the very narrow range of cases where given the nature of

the contract, emotional distress would be expected in the event of a breach. Those cases generally involve contracts where emotional concerns are at the core of the agreement between the parties. Erlich v. Menezes, 21 Cal. 4th 543, 559 (2013) citing Burgess v. Superior Court, 2 Cal. 4th 1064 (1992) (infant injured during childbirth); Molien v. Kaiser Found. Hosps., 27 Cal. 3d 916 (1980) (misdiagnosed venereal disease and subsequent failure of marriage); Chelini v. Nieri (1948) 32 Cal. 2d 480 (failure to adequately preserve a corpse].) Windeler v. Scheers Jewelers (1970) 8 Cal. App. 3d 844, 851-852 (bailment for heirloom jewelry where jewelry's great sentimental value was made known to bailee). In such cases, "when the express object of the contract is the mental and emotional well-being of one of the contracting parties, the breach of the contract may give rise to damages for mental suffering or emotional distress." Erlich v. Menezes, 21 Cal. 4th at 559.

There is no authority for the proposition that delay in providing a different level of care to a profoundly disabled individual like Aleta, where her basic care needs continued to be met in the interim and where additional services were ultimately provided, falls within the limited exception permitting tort liability represented by the cases above. Nor is there support for the even more attenuated argument that the provision of such services to Aleta expressly implicated Areta's mental and emotional well-being so as to permit tort damages to Areta directly.

Plaintiffs' Thirteenth through Fifteen Claims are accordingly dismissed, with leave to amend.

**F.  Rehabilitation Act Claims**

Under Section 504 of the Rehabilitation Act, a plaintiff must show (1) he or she is an "individual with a disability" (2) "otherwise qualified" to receive the benefit (3) but denied the benefits of the program solely by reason of his disability; (4) provided that the program receives federal financial assistance. See 29 U.S.C. § 794; Weinreich v. Los Angeles County Metro. Transp. Auth., 114 F.3d 976, 978 (9th Cir. 1997); Bonner v. Lewis, 857 F.2d 559, 562–63 (9th Cir.1988). The first three prerequisites mirror the

requirements for establishing a violation of Title III of the ADA, which similarly requires that a disabled individual be denied the benefits of a public accommodation because of his or her disability.  Molski v. J.J. Cable, Inc., 481 F.3d 724, 730 (9th Cir. 2007).

In order to demonstrate an additional claim under the Rehabilitation Act, then, a Plaintiff must first establish an ADA claim before going on to show that the program in question receives federal financial assistance.  Weinreich, 114 F.3d at 978.  Because Plaintiffs' only effort to establish an ADA violation is in arguing that Title III violations occurred, and because those claims currently fail for the reasons discussed above, Plaintiffs also have not satisfied the prerequisites for a viable Rehabilitation Act claim, either.  Moreover, and in any event, to the extent Plaintiffs have named Defendants McGlade, Ramirez and Smith individually in their Rehabilitation Act claims, that inclusion fails because a private individual cannot be liable under the Rehabilitation Act any more than he or she can be liable under the ADA.  McFadden v. Wash. Metro. Transit Auth., 949 F. Supp. 2d at 220 ("there is no individual liability under the ADA or the Rehabilitation Act.").

Plaintiffs' Sixteenth through Eighteenth Claims, which allege Rehabilitation Act causes of action against the various defendants, are therefore dismissed as to Defendants Alta, On My Own, and STEP, with leave to amend, and dismissed without any further leave as to Defendants McGlade, Ramirez, and Smith.

## CONCLUSION

For all the foregoing reasons, the Motions to Dismiss brought on behalf of the Alta, On My Own and STEP Defendants (ECF Nos. 49, 48, 54) are GRANTED except that the Court rejects STEP's argument that administrative remedies available to Plaintiffs were not properly exhausted.  Because Plaintiffs failed to obtain leave of court prior to adding additional claims in their FAC that were not present in their initial Complaint, and since the leave to amend accorded after Defendants' initial motions

under Rule 12(e) was granted did not entail any wholesale permission to add entirely new claims, Plaintiffs' First through Third, Tenth through Twelfth, and Nineteenth through Twenty-Fifth Claims are DISMISSED, without prejudice to being renewed should Plaintiffs obtain the requisite permission to do so.  Plaintiffs' Fourth through Sixth, Seventh through Ninth, Thirteenth through Fifteenth, and Sixteenth through Eighteenth Claims are DISMISSED, with leave to amend, except that no further leave to amend will be accorded as to the Fourth, Fifth, Seventeenth, and Eighteenth Claims to the extent they are alleged against Defendants McGlade, Ramirez and Smith.

Plaintiffs may file a Second Amended Complaint not later than twenty (20) days after the date this Memorandum and Order is electronically filed.  Failure to so amend within those time parameters will result in the case being dismissed, with prejudice and without further notice to the parties.

IT IS SO ORDERED.

Dated:  November 23, 2021

MORRISON C. ENGLAND, JR
SENIOR UNITED STATES DISTRICT JUDGE